**UNITED STATES of America,**
**Appellant,**

v.

**Rolando Reyes CONVENTO, Appellee.**
**No. 17805.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 16, 1964.

Decided July 7, 1964.

Mr. Max Frescoln, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellant.

Mr. David Carliner with whom Mr. Jack Wasserman, Washington, D. C., was on the brief, for appellee.

Before BAZELON, Chief Judge, and DANAHER and BURGER, Circuit Judges.

PER CURIAM.

The judgment of the District Court is affirmed. Chief Judge Bazelon votes to affirm for reasons stated in his opinion; Circuit Judge Burger votes to affirm on the basis of the opinion of District Judge Hart. 210 F.Supp. 265 (D.D.C.1962).

BAZELON, Chief Judge.

Appellee Convento enlisted in the United States Navy in the Philippine Islands in 1953, served continuously until 1957 when he re-enlisted in San Diego, California, and has continued to serve without interruption until the present time. The District Court correctly held he was eligible for naturalization under the expediting provisions of 8 U.S.C. § 1440(a) as one who "served honorably in an active-duty status in the * * * naval forces of the United States * * * during a period beginning June 25, 1950, and ending July 1, 1955," and "at the time of enlistment or induction * * * [was] in the United States, * * * whether or not he [was] lawfully admitted to the United States for permanent residence." [1] The Government appeals, claiming that both conditions above must be satisfied by the same enlistment.

Easing naturalization requirements for those who have served our country

---

1. Among other expediting provisions, no period of residence or specified period of physical presence is required of those who qualify under § 1440. Alien enemies may be naturalized without the loyalty investigation ordinarily required under 8 U.S.C. § 1442.

Most significant, however, is the elimination in § 1440(a) (1) of the requirement that the applicant have been "law-

fully admitted to the United States for permanent residence," since under present law this means exemption from immigrant quota requirements. The yearly Philippine quota is 100; as of January 15, 1964, the waiting list (for all preference categories, including non-preference, see 8 U.S.C. § 1153) was 11,184. U.S. Dept. of State, Visa Office Bulletin No. 123 (Jan. 15, 1964).

in wartime is a congressional policy of long standing. It is not simply a matter of reward; it is also a recognition that no further demonstration of attachment to this country and its ideals is necessary. Since appellee's case is within this congressional aim, the statute should not be read restrictively to bar him unless it is expressly commanded.

The Government argues that the words of the statute, literally read and against the background of legislative history, require his exclusion. While syntax may be better preserved by insisting that the enlistment between June 25, 1950 and July 1, 1955 be the one which occurs in the United States, the words of the statute do not compel it.[2] And there is no indication in the legislative history that Congress faced the problem of re-enlistments.

In the absence of the clearest indication that Congress intended to confer well-merited benefits in arbitrary and niggardly fashion, we must assume that it did not. This is the view adopted by the Court of Appeals for the Ninth Circuit in Villarin v. United States, 307 F. 2d 774 (1962), and by Judge Hart below. I therefore join in affirming the judgment.

---

2. Nor is the Government's reading necessary in order to avoid rendering § 1440 (a) (2) superfluous. That section eases naturalization requirements for a 1950–55 veteran who did not enlist in the United States if "at any time subsequent to enlistment or induction such person shall have been lawfully admitted to the United States for permanent residence." It extends the legislative policy to aliens who have not met the requirements of § 1440 (a) (1) by enlisting or re-enlisting in the United States.

The facts of this case do not require consideration whether uninterrupted service between the 1950–55 service and the re-enlistment is a prerequisite for qualification under § 1440(a) (1).

1. Petition for Naturalization of Convento, 210 F.Supp. 265 (D.D.C. 1962).

2. As that status of being "lawfully admitted" is defined in 8 U.S.C. § 1101(a) (20) (1958).

DANAHER, Circuit Judge (dissenting).

I am deeply sensible of the generosity of spirit which moved my colleagues to affirm the judgment of the District Court which had granted the appellee's petition for naturalization. Mere desire to reward the wartime service of the appellee is not enough, I fear. My reading of the record here and the legislative history of the governing statute do not support the reasons outlined by District Judge Hart in his opinion.[1] The circumstances involve much more than the plight of this particular applicant, for there are thousands similarly situated. I therefore will spell out in some detail the grounds for my dissent.

The Government contends and the appellee concedes that he had never "been lawfully admitted to the United States for permanent residence."[2] The Government therefore insists that Convento is ineligible for naturalization because of the requirements of 8 U.S.C. §§ 1427(a) and 1429 (1958)[3] which are not here waived within the purview of the 1961 amendments[4] to the Immigration and Nationality Act of 1952.

The appellee's November 28, 1961, petition for naturalization discloses that

---

3. 66 Stat. 242, 244.

4. 8 U.S.C. § 1440(a) (Supp. III, 1961), 75 Stat. 654, amending § 329(a) of the Act, 66 Stat. 250, provides in pertinent part:
   "Any person who, while an alien or a noncitizen national of the United States, has served honorably in an active-duty status in the * * * naval forces of the United States * * * during a period beginning June 25, 1950, and ending July 1, 1955 * * * may be naturalized as provided in this section if (1) at the time of enlistment or induction such person shall have been in the United States, the Canal Zone, American Samoa, or Swains Island, *whether or not he has been lawfully admitted to the United States for permanent residence*, or (2) at any time subsequent to enlistment or induction such person shall have been lawfully admitted to the United States for permanent residence." (Emphasis added.)

he first "entered the U. S. Navy" in the Philippines on July 17, 1953, and his claim of lawful admission into the United States at San Diego, California, via "U. S. Navy aircraft incident to military orders," where he "enlisted" on July 12, 1957. He has here asserted without contradiction that since July, 1953, he has engaged in continuous active duty in the United States Navy.

The Designated Naturalization Examiner concluded that Convento is not eligible for naturalization because he had not been lawfully admitted for permanent residence. Moreover, at the time of his 1953 enlistment, he was not in the United States or one of the named outlying possessions.[5] His 1957 re-enlistment, she concluded, could not operate to qualify Convento, *nunc pro tunc*, even though admittedly he had honorably rendered active Korean hostilities service.

The 1952 Act in section 310(d) (66 Stat. 239), provided that a person may be naturalized "under the conditions prescribed" and "not otherwise." Section 318 (66 Stat. 244), read: "Except as otherwise provided in this title, no person shall be naturalized unless he has been lawfully admitted to the United States for permanent residence."

### I

Section 328, (66 Stat. 249), dispensed with certain residence requirements of section 316, (66 Stat. 242), and expedited naturalization for one who at any time had honorably served an aggregate of three years in the armed forces. Additional benefits were provided for one with such service, if such person filed his petition for naturalization while still in the service or within six months of honorable termination of such service. Convento claims his case comes within this general section which in some circumstances entitles a petitioner to qualify "without having been physically present in the United States for any specified period." It would appear, on the contrary, that the language means that an alien who has honorably served for three years in the armed forces may have that time counted toward the requirement for actual residence. The entire three years' period might be spent in overseas service and yet be available to him for naturalization purposes. Section 328(b) still requires that such a petitioner who files under section 328(a) "shall comply in all other respects with the requirements of this title." There is in this section no exemption from the provisions of section 318 of the Act.[6]

### II

Convento would say in any event his entitlement arises under 8 U.S.C. § 1440 (a) (Supp. III, 1961), under which his petition had been filed. Looking first to the 1952 Act, it will be seen that section 329(a), (66 Stat. 250), authorized naturalization benefits for aliens or noncitizen nationals who had served honorably in an active duty status in the armed forces during World War I or World War II. No particular term of service was specified. Under clause (2) of that section, benefits were made available to one who had so served if "*at any time subsequent* to enlistment or induction such person shall have been lawfully admitted to the United States *for permanent residence.*" (Emphasis added.)[7]

---

5. See the statute, *supra* note 4.

6. Sing Chow v. United States, 327 F.2d 340 (9 Cir. 1964).
The Supreme Court commented: the "Act's general provision allowing aliens with three years' armed service at any time to be naturalized free of certain residence requirements provides *no exemption from the requirement that they have been 'lawfully admitted to* the United States for permanent residence.'" (Emphasis added.) Tak Shan Fong v.

United States, 359 U.S. 102, 104, 79 S. Ct. 637, 639, 3 L.Ed.2d 662 (1959); United States v. Sison, 272 F.2d 366 (9 Cir. 1959).

7. The President's Commission on Immigration and Naturalization under the chairmanship of Hon. Philip B. Perlman, then Solicitor General of the United States, at page 247 of its report to the President as of January 1, 1953, stated that the Immigration and Nationality Act of 1952

More important for present purposes, clause (1) made the benefits of the section available *"whether or not he has been lawfully admitted* to the United States for permanent residence" if *"at the time of enlistment* or induction such person shall have been in the United States, the Canal Zone, American Samoa, or Swains Island." (Emphasis added.)

The following year Congress for the first time turned to the problem of naturalization based upon honorable active duty service during the Korean hostilities. For a limited time and on petition to be filed not later than December 31, 1955, Public Law 86 [8] provided that "notwithstanding the provisions of sections 310(d) and 318," *supra*,[9] a person who after June 24, 1950 and not later than July 1, 1955, served, or "actively serves, honorably" for a period of not less than ninety days might be naturalized. Any such person must have been "lawfully admitted to the United States for permanent residence." Alternatively, if otherwise "lawfully admitted *to the United States"* in some different status, he must have "been *physically* present *within* the United States for a single period of at least one year at the time of entering the Armed Forces." (Emphasis added.) The Supreme Court held [10] that "lawful admission" at the time of entry, followed by the requisite residence, was a condition precedent to naturalization

under this special Act. Convento obviously did not and could not qualify under either of the alternative status and residential prerequisites.[11]

Convento tells us on brief that he had enlisted in the Philippines pursuant to an agreement effective December 13, 1952, entered into in accordance with Article XXVII of the Military Bases Agreement of 1947 (61 Stat. pt. 4, 4019). The American Ambassador and the Philippine Secretary of Foreign Affairs exchanged notes reciting that the United States Navy might accept for voluntary enlistments of four or six year terms not more than 1,000 Philippine citizens per calendar year with the privilege to qualified recruitees "to extend their enlistments or to re-enlist" for such period as might "entitle them to retirement under existing United States laws, if they elect to do so." [12]

There is no mention in the notes of a possible change in immigration status or of possible later naturalization benefits to recruitees. Naturalization of Korean hostilities veterans was not again examined by Congress until 1959 when Congressman Shelley introduced H.R. 7209 "According Certain Naturalization Privileges to Veterans of the Korean Hostilities." At the hearing on his bill, he explained that in his San Francisco district he had "Chinatown, the Chinese, Filipinos * * * a community of about

---

had "introduced conditions of increased severity," among which was the requirement "that the veteran must prove lawful admission to the United States for permanent reisdence." While veterans of World War I and World War II had been accorded certain special benefits which had not yet been extended to the veterans of the conflict in Korea, the Commission observed, the 1952 Act had carried forward "an earlier requirement that they must have been lawfully admitted for permanent residence" if they had not enlisted or been inducted in the United States.

Compare Act of June 1, 1948, 62 Stat. 281, 282, adding § 324A which provided benefits to those relying upon World War I or World War II service but which specified that at the time of entlistment

or induction such persons must have been in the United States or an outlying possession, *"excluding the Philippine Islands."* (Emphasis added.)

8. 67 Stat. 108, 8 U.S.C. § 1440a (Supp. I, 1952).

9. 66 Stat. 242, 244.

10. Tak Shan Fong v. United States, *supra* note 6.

11. Compare Aure v. United States, 225 F. 2d 88 (9 Cir. 1955) where a Filipino was thought to have acquired "status" because of his enlistment in April, 1946. But see the Act of June 1, 1948, 62 Stat. 282, 8 U.S.C. § 724a(a) (Supp. V, 1946), specifically "excluding the Philippine Islands."

12. 5 U.S.T. pt. 1, 373 TIAS 2931.

everything out there that seems to have immigration problems." H.R.Rep.No. 1925 [13] sets out the views of the Department of the Navy that section 3 of the bill would extend to Korean hostilities veterans the right to apply for citizenship "without the requirement that they be admitted into the United States for permanent residence within the immigration quotas." [14] Congressman Walter at the hearing estimated, according "to a very scientific appraisal, it is approximately 8,000 people" who would be affected by section 3 of the legislation.[15] He asserted that "the Navy has absolutely no authority to enter into an agreement with the Philippines concerning the enlistment of aliens * * * they go ahead and do it anyway." Section 3 was thereafter *stricken from the bill* and as amended, the bill was favorably reported. The legislation passed the House June 24, 1960, but was not taken up in the Senate before adjournment.

The following year the text of the Shelley bill as it had passed the House, was incorporated into Public Law 87–301.[16] Thus 8 U.S.C. § 1440(a) (1958)

was amended to extend to veterans of the Korean hostilities the same status as had been accorded to veterans of World War I and World War II by section 329 (a) of the 1952 Act.[17] And that status, insofar as a waiver of the otherwise strict requirements of the Act is here involved, depended upon an *enlistment* or induction—*in the United States*,[18] the Canal Zone, or *"in an outlying possession"* [19]—which resulted in an entry upon an active-duty honorable service "during a period beginning June 25, 1950, and ending July 1, 1955." Convento did not meet these conditions.

The policy of Congress is so thoroughly established and its purpose so clear, I can find no basis for a holding in favor of the appellee. Like several thousand others similarly situated, he has never been "lawfully admitted to the United States for permanent residence." His coming ashore on leave from duty status at San Diego in 1957 and his re-enlistment then and there did not satisfy the requirements of the Act.

We should reverse.

13. 86th Cong., 2d Sess. The House Report No. 1925, accompanying the bill, pp. 2 and 3, contains two paragraphs which were omitted from the Navy Department's letter as reproduced in 2 U.S.Code Cong. & Ad.News, p. 2978, 87th Cong., 1st Sess. (1961).

14. The Assistant Commissioner for Naturalization testified that "the only large group who would undoubtedly be benefited by this would be * * * the Philippine servicemen who were enlisted in the U.S. Navy."

15. At argument we were told—but without record references—that about 2,400 are situated similarly to Convento.

16. *Supra* note 4.

17. Compare § 324A as added to the Nationality Act of 1940, 62 Stat. 281, 282,

note 11 *supra* and note 19 *infra.* And see Villarin v. United States, 307 F.2d 774 (9 Cir. 1962) where the petitioner had enlisted in 1928 when he was *in the United States* and was later recalled for active service throughout World War II.

18. As defined in § 101(a) (38) of the Act, 66 Stat. 171, 8 U.S.C. § 1101(a) (38) (1958). And see Petition for Naturalization of Mata, 196 F.Supp. 523 (N.D.Cal. 1961).

19. As the language appears in H.R.Rep. No. 1365, 82d Cong., 2d Sess. 79, which further explained that § 329 substantially carried forward the provisions of the Nationality Act of 1940, as amended, 62 Stat. 282. The 1948 Act specifically excluded the Philippine Islands from the term "outlying possession." See note 11 *supra.*